**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | CASE NO. 16-34028 |
| | ) | CHAPTER 11 |
| NORTHSTAR OFFSHORE GROUP, LLC | ) | |
| DEBTOR | ) | JUDGE MARVIN ISGUR |

| | | |
|---|---|---|
| **NORTHSTAR OFFSHORE GROUP, LLC,** | § | |
| **PLAINTIFF,** | § | |
| | § | |
| **vs.** | § | **ADV. NO. 17-ad-3448** |
| | § | |
| **PEREGRINE OIL & GAS, LP** | § | |
| **PEREGRINE OIL & GAS II, LP** | § | |
| **DEFENDANTS.** | § | |

## DEFENDANTS' FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES
## and
## COUNTERCLAIMS

Defendants, Peregrine Oil & Gas, LP ("Peregrine O&G") and Peregrine Oil & Gas II, LLC ("Peregrine II"), (collectively "Peregrine"), file this First Amended Answer and Affirmative Defenses to the Original Complaint of Northstar Offshore Group, LLC, ("Northstar"), and file their Counterclaims against Northstar.

### I. DEFENDANTS' ADMISSIONS AND DENIALS

1. Peregrine denies the allegations in Paragraph 1, except to admit that this is an adversary proceeding.

2. Peregrine admits the allegations in Paragraphs 2 through 5 as to jurisdiction and venue.

3. Peregrine admits the allegations in Paragraphs 6 through 8 regarding the identification of the parties.

4. Peregrine admits the allegations in Paragraphs 9 through 11 regarding the procedural

history of the case.

5.  Peregrine denies the allegations in Paragraphs 12 and 13.

6.  Peregrine denies the allegations in Paragraphs 14 and 15.

7.  Peregrine re-asserts their admissions and denials as stated above as to the allegations of Paragraph 16.

8.  Peregrine admits that Paragraph 18 correctly quotes Bankruptcy Code Section 542(b).

9.  Peregrine denies the allegations in Paragraphs 19 through 21.

10. Peregrine admits that Paragraph 22 allegedly states Northstar's demands.

11. Peregrine re-asserts their admissions and denials as stated above as to the allegations of Paragraph 23.

12. Peregrine denies the allegations in Paragraphs 24 through 27.

13. Peregrine admits that Paragraph 28 allegedly states Northstar's demands.

## II. DEFENSES

14. Subject to and without waiving the foregoing Answer, Peregrine assert the following defenses:

  a)  Northstar breached the contract.

  b)  Northstar failed to allege the basis for the amounts claimed.

  c)  Repudiation of the Contract. Northstar terminated the contract it seeks to enforce. Northstar indicated by unconditional words, without just excuse, that it would not perform its contractual obligations.

  d)  Accord and satisfaction –Northstar agreed with Peregrine to resolve any and all claims by the acceptance of an agreed payment.

  e)  Compromise and Settlement – Northstar agreed with Peregrine to compromise

amounts allegedly due to Northstar in settlement of certain claims by Peregrine.

f)   Novation. The parties agreed to the September 11, 2015 letter agreement as a replacement to the West Cameron Block 269-JA Production Handling Agreement as a resolution of all claims and amounts due.

g)   Implied condition.  Peregrine's performance is excused because it was contingent on the continuing ability of Northstar to provide production handling services.  Through no fault of Peregrine, those circumstances ceased to exist.

h)   Peregrine is entitled to offset any amounts owed to Northstar by the amounts owed to Peregrine on the Counterclaims asserted herein.

i)   Northstar has failed to mitigate its damages.

j)   Northstar's actions have rendered performance impossible.

k)   Northstar has waived its claims.

l)   Northstar is estopped to make these claims.

### III. COUNTERCLAIMS

15. Peregrine files their counterclaims against Northstar and states as follows:

16. Northstar instigated this litigation and is before the Court.  Service of the counterclaims may be made upon counsel of record.

17. Peregrine incorporates its answers to the foregoing allegations for the purpose of its Counterclaims.

A.   **HIGH ISLAND BLOCK A-442 and HIGH ISLAND BLOCK A-268**

18. Peregrine O&G alleges that Northstar tortiously interfered with Peregrine O&G's existing contracts and prospective business relationships.  Northstar's claims are based on an Agreement in which Northstar agreed, among other things, to allow Peregrine O&G access to the

High Island A-442 "A" platform (the "HI A-442-A Platform") and the pipeline and pipeline right of way ("ROW").  Northstar intentionally refused to allow "open access" to the pipeline and ROW in violation of federal law.  Northstar also refused to allow Peregrine O&G to employ a contract operator to lease and operate the HI A-442–A Platform.

19. Peregrine O&G is an owner of working interests in federal Lease OCS-G 22268 covering High Island Area, East Addition, South Extension Block A-268 ("HI A-268").

20. Northstar Offshore Group, LLC ("Northstar") and Rosetta Resources Offshore, LLC ("Rosetta") historically handled, processed, and transported natural gas on the outer Continental Shelf, including their own production from High Island Block A-442, and third party production, including that of Peregrine, from HI A-268.

21. On July 12, 2007, Peregrine O&G and other natural gas producers entered into a Production Handling Agreement (the "HI 442 PHA") (attached hereto as Exhibit A) with Maritech Resources, Inc., and Rosetta regarding production from High Island Block A-442, and third party production, including that of Peregrine O&G, from HI A-268.  Maritech subsequently assigned its rights and obligations under this agreement to Black Elk Offshore Operations, LLC, which subsequently assigned its rights and obligations to Northstar.

22. Under Section 3.1 of the HI 442 PHA, Northstar agreed to handle and process Peregrine O&G's HI A-268 production through Northstar's HI A-442-A Platform and to redeliver the processed gas at the sub-sea tie-in where Northstar's six-inch gas pipeline (MMS Segment No. 10774) (hereinafter referred to as the "Subject Pipeline") from the HI A-442-A Platform connects to High Island Offshore System, L.L.C. 's ("HIOS") gas pipeline in High Island Block A-283 (MMS Segment 4592).

23. The Subject Pipeline is jointly owned by Northstar and Rosetta and operated by

Northstar.

24. Peregrine O&G has depended on, and has been receiving transportation service over, the Subject Pipeline and the HIOS under the terms of the HI 442 PHA since September 7, 2007.

25. Other than by using the Subject Pipeline, there is no other pipeline in operation that can deliver Peregrine O&G's HI A-268 production to the HIOS pipeline and no other way to get that production to shore, absent construction of a new line.

26. By letter of October 13, 2016 (attached hereto as Exhibit B), Northstar notified Peregrine O&G that Northstar and Rosetta's own production from its HI A-442-A Platform had depleted to "uneconomic levels, therefore, necessitating termination of the (HI 442) PHA processing arrangement provided for in the subject PHA."

27. In its October 13, 2016 letter, Northstar stated that if Peregrine O&G desired to continue to receive processing and transportation through the HI A-442-A Platform and facilities, it would be afforded an opportunity to either acquire the HI A-442-A Platform and facilities, or pay to Northstar a monthly Platform Rental Fee for the continued use of the Platform.  Peregrine O&G did not agree to pay the Platform Rental Fee and Peregrine O&G refused to acquire the HI A-442-A Platform and facilities.  Northstar acknowledged that the production of oil and gas had become uneconomic.  Northstar still has the obligation to plug and abandon the wells and bonding/surety responsibilities for the HI A-442-A Platform and Northstar would benefit from shifting this expensive obligation onto Peregrine O&G.

28. Peregrine O&G then spent weeks attempting to negotiate a lease with Northstar to allow Peregrine O&G to use the HI A-442-A Platform and continue processing Peregrine O&G's HI A268-A platform production, but was unable to reach agreement. At every step of this negotiation, Northstar sought to offload its plug and abandonment and bonding/surety

responsibilities for the HI A-442-A Platform to Peregrine O&G by having Peregrine O&G become operator.

29. By letter of March 7, 2017 (attached hereto as Exhibit C), Peregrine O&G offered to acquire the Subject Pipeline under the following terms:

    a. Peregrine O&G would agree to disconnect the Subject Pipeline from the 442-A Platform and connect it directly to the production line from the Peregrine-operated High Island A-268-A platform at the Peregrine's sole expense.

    b. Peregrine O&G would indemnify the Northstar for all costs associated with its proposal, including future abandonment liability for the Subject Pipeline.

30. Peregrine O&G requested a prompt response to this proposal to ensure Peregrine O&G would have continued access to the Subject Pipeline for its production from High Island A-268-A platform, given the then-approaching expiration of Northstar's OCS Lease for High Island A-442 on March 27, 2017.

31. Peregrine O&G received no response from Northstar before Northstar's OCS Lease for HI A-442 expired for lack of production on March 27, 2017.

32. With the expiration of Northstar's OCS Lease for HI block A-442, the Subject Pipeline has no current or potential use other than to transport Peregrine O&G's HI A-268-A platform production.

33. Still having received no response to their March 7, 2017 proposal, Peregrine O&G sent a letter to Northstar on April 21, 2017 (attached hereto as Exhibit D), explaining why it believes its offer was generous and that Northstar's failure to respond amounts to a denial of open and non-discriminatory access in violation of OCSLA that will lead to a waste of OCS resources.

34. By email of April 26, 2017 (attached hereto as Exhibit E), Northstar finally replied to Peregrine O&G's proposal, saying that they would accept Peregrine O&G's offer if Peregrine O&G agrees to, among other things, pay Northstar $500,000.

35. By letter of April 27, 2017 (attached hereto as Exhibit F), Peregrine O&G rejected Northstar's $500,000 proposal but offered to pay $10,000 for the Subject Pipeline in addition to the other compensation and protections Peregrine O&G had previously offered or that had been requested in Northstar's April 26 email.  Peregrine O&G stated that its offer would expire at close of business on April 28, 2017.

36. Peregrine O&G received no response from Northstar before the expiration of this latest offer.

37. As of the filing date of the Complaint, Northstar claims that Peregrine O&G has no right to flow gas over the Subject Pipeline and has shut in Peregrine O&G's production from HI 268-A.

38. A shut-in of Peregrine O&G's production affects proven reserves of 11 Bcf of natural gas and 42,000 barrels of condensate that is scheduled to be recovered from the HI A-268-A platform as of December 31, 2016. The estimated value of Peregrine's interest in the affected reserves is $2.4 million.

39. As a practical matter, all of this production will remain shut-in unless and until there is an available pipeline to carry it.  Building a new line would be inefficient and wasteful.  The cost of laying a new line is estimated to be over $2 million.  Therefore, these reserves will be lost entirely if Northstar's currently defunct pipeline is not reconfigured as Peregrine O&G has proposed.  Additionally, in the absence of production, Peregrine O&G's lease will expire.

40. Promissory Estoppel.  In the alternative, if no contract is determined to exist, Peregrine O&G asserts a cause of action against Northstar for promissory estoppel.

41. Northstar promised to provide handling and transportation of Peregrine O&G's production from the HI A-268-A platform through the HI A-442-A Platform to the HIOS

pipeline. Since this handling and transportation had been provided by Northstar's predecessors beginning in 2007 and by Northstar beginning in 2014, Peregrine O&G reasonably relied on this promise to its detriment. This reliance was foreseeable to Northstar. The only way to avoid injustice is to enforce the Northstar's promise to provide handling and transportation services to Peregrine O&G or to allow Peregrine O&G to assume responsibility for the Subject Pipeline and associated facilities at the 442-A Platform on the terms proposed by Peregrine O&G or to pay Peregrine O&G damages in the amount of $2,400,000 for loss of reserves.

42. Tortious Interference with Prospective Business Relations. Peregrine O&G asserts a cause of action against Northstar for tortious interference with prospective business relations. Peregrine restates and re-alleges Paragraphs 18 through 39 of its counterclaim as and for its cause of action for tortious interference with prospective business relations.

43. Peregrine O&G has business relationships with natural gas purchasers that have not yet been reduced to a contract and Peregrine O&G has a continuing business relationship with these natural gas purchasers that has not been formalized by a written contract. Northstar intentionally interfered with those prospective relationships.

44. Since 2014 Northstar has had knowledge of Peregrine O&G's gas sales from the HI 268 Platform to natural gas purchasers. Northstar's interference with Peregrine O&G's ability to perform these natural gas sales contracts was a direct result of Northstar's interference with Peregrine O&G's performance of its prospective delivery obligations. Northstar's conduct was and is independently tortious or unlawful. Northstar, as the holder of a pipeline right of way from the Department of the Interior, has the legal duty to offer open access to the Subject Pipeline on reasonable terms. As demonstrated by Exhibits B & E, Northstar's conditions to "open access" were not reasonable.

45. Northstar has no privilege to refuse to allow "open access" to the Subject Pipeline. This interference has and is proximately and directly causing actual damages to Peregrine O&G.

46. Tortious Interference with Existing Contracts. Peregrine O&G asserts a cause of action against Northstar for tortious interference with existing natural gas sales contracts between Peregrine O&G and natural gas purchasers. Peregrine O&G restates and re-alleges Paragraphs 18 through 39 and 41 of its counterclaim as and for its cause of action for tortious interference with existing contracts.

47. Peregrine O&G has existing contracts for the sale of natural gas to various natural gas purchasers. Peregrine O&G has been selling natural gas to these various natural gas purchasers since 2007. Northstar has knowledge of these sales as Northstar provided handling and pipeline transportation for these sales from Peregrine O&G to various natural gas purchasers from 2014 until Northstar intentionally terminated these services and shut-in the well on May 2, 2017.

48. Northstar's intentional termination of these services is unlawful under the open access provisions of the pipeline right of way granted by the Department of the Interior to Northstar's predecessors and succeeded to by Northstar, subject to all of the terms and conditions of the grant. Northstar has unreasonably withheld open access for Peregrine O&G's HI 268 Platform production to the HI 442-A pipeline connecting to the HIOS pipeline. Northstar has imposed unreasonable conditions for granting open access. These actions are direct and proximate violations of the open access provisions.

49. As a direct and proximate result of Northstar's denial of open access to the HI 442-A pipeline and associated facilities allowing connection to the HIOS pipeline, Peregrine O&G's existing contracts to sell natural gas have been interrupted and have become un-performable. As the direct and proximate result of this interference, Peregrine O&G has been damaged as the

result of lost natural gas sales.

**B.**     **WEST CAMERON PLATFORM 269-JA**

50. In addition to the tortious interference with prospective business relations and tortious interference with existing contracts with Peregrine O&G, Northstar has breached its agreements with Peregrine II with regard to the West Cameron 269-JA platform (the "WC 269-JA Host Processing Facility") and lease operations under the Offshore Operating Agreement (defined in Item 50. below) affecting federal lease Serial No. OCS-G 13563, effective 8/1/1992, covering all of West Cameron Block 269 ("Lease G-13563").

51. Northstar, Peregrine II, Fieldwood Energy, LLC and Castex Offshore, Inc. are the joint owners of the Lease G-13563 #JA008 well (the "#JA008 Well") drilled from a surface location on the WC 269-JA Host Processing Facility under the terms of a Farmout Agreement dated November 23, 2009.

52. The #JA008 Well is operated by Northstar under the Offshore Operating Agreement between the above-named well owners dated December 1, 2011 ("the "Offshore Operating Agreement" attached hereto as Exhibit G).  Northstar did not reject this contract.

53. Under Article 5.2 of the Offshore Operating Agreement, Northstar, as Operator, has a duty to "conduct all operations in a good and workmanlike manner as would a reasonable prudent operator under the same or similar circumstances."

54. The Offshore Operating Agreement includes Exhibit "C" – Accounting Procedure Offshore Joint Operations which governs the charges and credits to the joint account which are to be shared by the parties to the Offshore Operating Agreement.

55. Northstar is the sole owner and operator of the WC 269-JA Host Processing Facility located on West Cameron Block 269, West Cameron Area, Offshore Louisiana.

56. Prior to institution of the core proceeding in the captioned matter, Northstar handled, processed, and transported natural gas on the Outer Continental Shelf, including their own production from West Cameron Block 269, and third party production, including that of Peregrine II, from the #JA008 Well.

57. On January 24 2011, Peregrine II and other natural gas producers entered into a Production Handling Agreement (the "WC 269-JA PHA") (attached hereto as Exhibit H) with Phoenix Exploration ("Phoenix"), Merit Management Partners I, L.P., Merit Management Partners II, L.P., Merit Management Partners III, L.P., Merit Management Partners D-III, L.P., Merit Management Partners E-III, L.P., Merit Management Partners F-III, L.P., and Merit Energy Company, LLC (collectively, "Merit").   Merit subsequently assigned its rights and obligations under this agreement to Black Elk Offshore Operations, LLC, which subsequently assigned its rights and obligations to Northstar.

58. Under Section 1.01 of the WC 269-JA PHA, Northstar agreed to handle and process the #JA008 Well production on Northstar's WC 269-JA Host Processing Facility through the tie-in from the #JA008 Well manifold interconnecting the #JA008 Well to the WC 269-JA Host Processing Facility in-take flange.

59. Under Section 1.02 and 1.03 of the WC 269-JA PHA, Northstar agreed to deliver oil and gas production to the oil or gas export sales pipeline serving the Host Processing Facility after processing.

60. The export sales pipeline ("Subject Pipeline") is owned by Stingray Pipeline Company ("Stingray"), but is operated by Starfish Pipeline Company ("Starfish").

61. Northstar's use of the Subject Pipeline was governed by various contracts which were rejected by Northstar in the Bankruptcy proceedings ((case No. 16-34028, Doc #70) (the

"Starfish Contracts").  However, as noted, Northstar did not reject the OOA.

62. The #JA008 Well is dependent on, and has been receiving transportation service over, the Subject Pipeline under the terms of the WC 269-JA PHA since January 24, 2011.

63. Other than by using the Subject Pipeline, there is no other pipeline in operation that can deliver #JA008 Well production to shore, absent construction of a new line.

64. By letter of September 11, 2015, (the "Letter Agreement" attached hereto as Exhibit I), Northstar notified Peregrine II, and the other #JA008 Well owners, that Northstar's own production from its West Cameron 269 JA 4 well had reached "its economic limit and has been shut in and a plug set to secure the well," therefore, necessitating termination of the (West Cameron) PHA processing arrangement provided for in the WC 269-JA PHA." Northstar proposed under Article 13 of the WC 269-JA PHA to "negotiate in good faith to (i) continue Producer's payment of all fees due Processor, and (ii) enter into a lease agreement for the Host Processing Facility."  Northstar's alternate proposal was for Northstar to "unman the Platform and place the Platform in a loop with a contract operator and the #JA008 Well owners assume the costs associated with the #JA008 Well and the Platform."  Significantly, this proposal left Northstar liable for the future costs of decommissioning and abandonment of the platform and contemplated a "more formal agreement" to be circulated at a later date.  All parties executed the Letter Agreement.

65. Pursuant to the informal September 2015 agreement, a formal Cost Sharing Agreement (the "Proposed CSA" attached hereto as Exhibit J) was circulated among the parties.  The Proposed CSA provided that Northstar would remain liable for the abandonment, removal and decommissioning of the Host Processing Facility Platform.  The Proposed CSA would have superceded the WC 269-JA PHA in its entirety and provided for the #JA008 Well owners' use of

the Platform with no payment of rentalor payment of a fee by the #JA008 Well owners to Northstar.  In exchange, Northstar, Peregrine II, Fieldwood Energy, LLC and Castex Offshore, Inc. (owners of the #JA008 Well) would agree to be responsible for all expenses associated with operation and maintenance of the Host Processing Facility Platform.   The Proposed CSA was signed by Peregrine II and Northstar, but was not executed by Fieldwood Energy, LLC and Castex Offshore, Inc.

66. Despite the written termination of the West Cameron PHA and the failure of the parties to agree on a Cost Sharing Agreement, Northstar continued to invoice Peregrine II for its share of services allegedly provided to the #JA008 Well.

67. Northstar also submitted invoices to Peregrine II which included charges for the Host Processing Facility Platform not associated with the #JA008 Well.  For example, Northstar has invoiced Peregrine II for charges associated with a leased compressor.  The lease for the compressor was rejected with the Starfish Contracts in the core proceeding and is not used to provide any services to the #JA008 Well.  Peregrine has assumed that these invoices are part of Northstar's claim in this Adversary Proceeding although no Invoices were attached to the Complaint.

68. Northstar's rejection of the Starfish Contracts resulted in Peregrine II's inability to transport production from the WC 269-JA Host Processing Facility platform to the shore, thus the #JA008 Well had to be shut-in.   Northstar's rejection of the Starfish Contracts makes performance by Peregrine II impossible.  Northstar's rejection of the Starfish Contracts breaches the Offshore Operating Agreement between Peregrine II and Northstar.  This breach of contract has directly and proximately damaged Peregrine II and may result in the loss of the oil and gas lease.

69. Peregrine II has been damaged by its inability to produce and sell natural gas from the #JA008 Well.  The #JA008 Well is the last well on the oil and gas lease.  The #JA008 Well is maintaining the oil and gas lease.  Without production, the #JA008 Well will not maintain the oil and gas lease and the oil and gas lease will revert to the Department of the Interior.  Peregrine II will be damaged in an amount in excess of $2,000,000.

70. At the joint owners' meeting held on February 6, 2017, Peregrine II offered to become the successor Operator for the #JA008 Well under the following terms:

    a.  Peregrine II would agree to perform a (wireline) workover operation to remove the downhole choke at the expense of the joint owners.

    b.  Peregrine II would 'carry' Northstar's share of the expense.

Northstar rejected Peregrine II's offer.  Peregrine II attempted on numerous occasions after the February 6, 2017 meeting to negotiate with Northstar regarding the operations and workover needed on the #JA008 Well in order to increase production from the well, but Northstar consistently refused all offers.

71. Northstar breached its obligation to perform all operations in a good and workmanlike manner under the Offshore Operating Agreement by failing to perform a necessary workover operation to increase production and by failing to agree to allow Peregrine II to perform the necessary workover.

72. Northstar breached its obligations under the Letter Agreement by charging the #JA008 Well owners for WC 269-JA Host Processing Facility platform expenses which have been discharged in the core proceeding and/or would have been incurred only under contracts which have been rejected in the core proceeding.

73.    Further, Northstar's rejection of the Starfish Contracts was grossly negligent and amounts to willful misconduct in violation of the Offshore Operations Agreement because it

resulted in the shutting-in and the loss of production from the #JA008 Well.

74.     Peregrine additionally seeks an award of its reasonable and necessary attorneys' fees and costs of Court under Texas Civil Practice and Remedies Code § 38.001 as the obligations breached by Defendant are contained in a written contract for which attorney's fees and costs shall be awarded.

### III. PRAYER

Accordingly, Defendants respectfully pray that, upon final disposition of this case, Plaintiff take nothing by reason of Plaintiff's allegations against Defendants.

Further, Defendants respectfully pray that the Court enter judgment as follows:

a. Monetary judgment in favor of Defendants against the Plaintiff, Northstar Offshore Group, LLC, in the amount of $4,400,000.00;

b. Judgment for interest, the costs of this action and a reasonable attorney fee; and

c. Such further relief as may be just.

> Respectfully submitted,
> **Jones Gill LLP**
> */s/ Michael D. Jones*
> Michael Jones,
> TX Bar No. 10929350,  SDTX Bar No. 7699
> Teresa N. Smith
> TX Bar No. 786883; SDTX Bar No. 2961546
> 6363 Woodway, Suite 1100
> Houston, TX 77057
> (713) 652-4068
> (713) 652-0716 (Fax)
> Attorneys for Peregrine Oil & Gas, LP
> and Peregrine Oil & Gas II, LLC

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 11, 2018. I electronically filed this Original Answer with the Clerk of Court using the *CM/ECF* System, which will send notification by e-mail of such filing to all counsel of record in the adversary proceeding.


*/s/ Michael D. Jones*
MICHAEL D. JONES